IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL C. YANCHAK, individually and on behalf of others similarly situated,<br><br>    Plaintiff,<br> v.<br><br>CANNERY CASINO RESORTS, LLC and WASHINGTON TROTTING ASSOCIATION, INC.<br><br>    Defendants. | **Civil Action No.:**<br><br>**Class and Collective Action**<br><br>**JURY TRIAL DEMANDED**<br><br><br>**Electronically Filed** |

## COMPLAINT

Plaintiff, Michael C. Yanchak, on behalf of himself, a class, and a collective of similarly situated individuals, by and through his attorneys, Stember Cohn & Davidson-Welling, LLC, brings this Complaint against Defendants and alleges as follows:

### I. INTRODUCTION

1. In July 2010, the Meadows Racetrack and Casino (the "Casino") in Washington County, Pennsylvania began operating table games, including blackjack and poker.  Plaintiff and more than 350 similarly situated individuals are, or were, employed as dealers at the Casino by Defendants Cannery Casino Resorts, LLC ("CCR") and Washington Trotting Association, Inc. ("WTA") (collectively, "The Meadows").  Under The Meadows' longstanding policy, dealers are required to perform work before and after each shift, for which they are not paid. Consequently, for each week a full-time dealer has worked since July 2010, the Meadows now owes him 30 minutes to an hour (or more) of regular (and/or overtime) pay, under state and federal wage laws.

2. This lawsuit is brought as: (a) a collective action under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ("FLSA"); and (b) a class action under Pennsylvania law, to recover unpaid wages, including overtime, liquidated damages, and penalties on behalf of Plaintiff and similarly situated employees.

## II. THE PARTIES

3. Plaintiff Michael C. Yanchak is an adult individual who resides in Allegheny County, Pennsylvania. From July 2010 until July 1, 2013, he was employed by The Meadows as a dealer in the Table Games Department of the Casino. He was hired on an "hourly" basis at $7.25/hr.; plus gratuities, received several raises, and by July 2013 was earning $7.70/hr., plus gratuities. The Meadows failed to pay Plaintiff at his proper hourly rate for work he was required to perform before or after scheduled shifts, including failing to pay him overtime pay on those occasions when he worked more than 40 hours per week due to pre- and post-shift work. He has consented in writing to be a plaintiff in this FLSA action in accordance with 29 U.S.C. § 216(b). His consent is attached as **Exhibit 1**.

4. Defendant Cannery Casino Resorts, LLC ("CCR"), is a Nevada limited liability company headquartered in Las Vegas, Nevada. CCR develops and operates hotels and casinos. According to the Casino website (www.meadowsgaming.com/about-us), CCR "owns and operates the Meadows Racetrack & Casino®" and other casino resorts in Nevada. At all times material, CCR was an "employer" within the meaning of the applicable Pennsylvania and federal wage laws, and employed Plaintiff and similarly situated dealers at the Casino.

5. Defendant Washington Trotting Association, Inc. ("WTA") is a subsidiary of CCR and a Delaware corporation headquartered at 210 Racetrack Road, Meadow Lands, PA 15347 (at the Meadows Casino). At all times material, WTA was an "employer" within the

2

meaning of the applicable Pennsylvania and federal wage laws and employed Plaintiff and similarly situated dealers at the Casino.

6. At all relevant times, The Meadows was engaged in commerce and Plaintiff and similarly situated dealers provided services in commerce.

## III.  JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Plaintiff's FLSA claim under 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331 and 1337, and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1392, as the acts that give rise to these claims occurred in this District, and The Meadows employed Plaintiff in and regularly transacts business in this District.

## IV.  FACTS

**A.   The Meadows Table Games Department**

9. When it opened in 2007, the Casino did not offer table games.

10. Effective January 2010, the Pennsylvania Race Horse Development and Gaming Act was amended to allow for table games in the Commonwealth. See 4 Pa. C.S. § 711 *et seq.*

11. Thereafter, The Meadows created a Table Games Department and, in July 2010, the Casino began offering blackjack, poker, roulette, craps, minibaccarat, big six wheel, and other table games to patrons.

12. The Casino currently operates 75 tables that offer a variety of games. (http://gamingcontrolboard.pa.gov/?pr=548) (Nov. 18, 2013).

13. The Table Games Department operates around the clock, 7 days a week, with more than 500 employees, including more than 250 non-poker dealers, 100 poker dealers, and 50 floor supervisors. See WTA's Petition for Approval of Table Games at Appendix 4, attached as **Exhibit 2**.

14. The Casino's Table Games Department generates tens of millions of dollars of gross revenue each year. (http://gamingcontrolboard.pa.gov/?pr=498) (Jan. 16, 2013).

**B.     CCR and WTA Jointly Employ Meadows' Dealers**

15. WTA is registered with the Pennsylvania Department of State and does business as "The Meadows Racetrack and Casino."

16. WTA is the licensee authorized to offer table games at the Meadows. See **Exhibit 3** (PR Newswire Article).

17. WTA is the employer of record of Meadows dealers, and is identified on paystubs and W-2s provided to dealers, including Plaintiff.

18. CCR and WTA are joint employers for purposes of the FLSA and Pennsylvania law, because: (1) their operations are interrelated; (2) they share common management, including human resources and compliance oversight; and (3) CCR has and exercises significant control over the terms and conditions of employment of Casino dealers.

19. The Meadows utilizes an integrated management structure, in which WTA managers report to CCR managers and principals.

20. CCR holds itself out as owner and operator of the Casino. See **Exhibit 4**.

21. According to the "Employee Handbook" that The Meadows distributes to Casino employees, CCR directly controls many of the terms and conditions of work. The Handbook includes policies that govern attendance, discipline, work hours and pay, and expressly reserves

CCR's "right" to "terminate… any employee at its sole discretion."  A copy of the Employee Handbook is attached as **Exhibit 5**.

22. In the Employee Handbook, The Meadows represents that, "**As an employee of Cannery Casino Resorts, this is <u>your</u> handbook**…" Ex.5 (all emphasis original).

C. <u>The Job</u>

23. The Meadows has regularly employed upwards of 350 full- and part-time dealers in the Casino's Table Games Department.

24. Full-time dealers are generally scheduled to work 5 days a week, 8 hours a day, or 4 days a week, 10 hours a day.  Part-time dealers are generally scheduled to work 2 or 3 days a week, 8 hours a day.

25. Dealers typically work one of three main shifts: "day shift" (most commonly 11 a.m.–7 p.m.), "swing shift" (most commonly 7pm to 3am), or "grave shift" (most commonly 3 a.m.–11 a.m.).

26. During each shift, dealers are assigned to host gaming tables (*e.g.*, craps, blackjack or baccarat tables) or other duties related to table game operations.

27. The Meadows classifies dealers as "hourly," and promises them they will be paid "hourly" and retain tips (subject to departmental tip-sharing policy).

28. Upon information and belief, at hire and whenever a dealer's hourly wage is changed, The Meadows completes a "Cannery Casino Resorts Personnel Action Notice" identifying this position as "hourly" and recording the applicable hourly rate going forward.

29. The Employee Handbook assures employees that "paychecks are issued…for hours worked during the previous pay period."

30.     The Handbook further promises: "Hourly rated (non-exempt) employees will be paid at one-and-one-half times (150%) their regular rate for all hours worked in excess of 40 hours in a scheduled work week…in accordance with Pennsylvania law and FLSA regulations."

**D.    Pre-Shift Work**

31.     Dealers' scheduled shifts begin exactly on the hour (*e.g.*, 7:00 a.m., 3:00 p.m., 11:00 p.m.), and dealers must clock in before each shift begins.

32.     Since July 2010, when the Casino began operating table games, supervisors have instructed dealers that they must clock in 7 minutes or less—and **not** earlier—before their shift begins **and** be on the floor, ready to work 5 minutes before the actual shift start time.

33.     To comply with these instructions, dealers have to clock in 6 to 7 minutes early before every shift.

34.     After a dealer clocks in, he begins working immediately.

35.     The Meadows conducts pre-shift meetings for "day shift" dealers daily and once or twice a week for dealers assigned to "grave shift." Meetings for the "day shift" and "grave shift" begin about 5 minutes before the actual shift starting time, at 10:55 a.m. and 2:55 a.m., respectively. The Meadows holds daily pre-shift meetings for "swing shift" dealers at 6:45 p.m., before clock-in. Managers use these meetings to make job assignments and provide work-related information.

36.     If "day shift" dealers are going to comply with management's instructions, they must: (1) clock in about 7 minutes before the hour (*e.g.*, 10:53 a.m.), (2) check their schedule in the employee dining room; (3) attend a daily pre-shift meeting; (4) go to the assigned "pit"; (5) double-check their assignment on the board at the "pit"; and (6) report to their assigned games to wait for a break in play to "tap in" (*i.e.*, relieve the dealer at that table).

37. If "grave shift" dealers are going to comply with management's instructions, they must: (1) clock in about 7 minutes before the hour (*e.g.*, 2.53 a.m.); (2) attend any scheduled pre-shift meeting; (3) meet the pit manager on the floor to get assignments; and (4) go to the assigned table to wait to "tap in."

38. If "swing shift" dealers are going to comply with management's instructions they must: (1) attend daily (off-the-clock) 6:45 p.m. pre-shift meetings; (2) clock in at about 6:53 p.m.; (3) check their schedule in the dining room (unless they did so before clock-in); (4) go to the assigned "pit"; (5) re-check assignments on the board at the "pit"; and (6) report to their assigned games to wait to "tap in" or, if assigned to a new table, wait for a manager and assist him in opening a new table.

39. Since 2010, The Meadows has used a "rounding" policy to determine the time a dealer has worked for purposes of calculating his wages. When a dealer clocks in 7 minutes or less before his shift starting time (which he must do) and then works during this 7-minute period (which he must also do), his work during this period is rounded down to 0 minutes.

40. As a result of the rounding policy, all work performed during the 7 minutes before each shift is unpaid.

41. Federal law permits employers to round up or down to the nearest quarter hour, but only if they do so in "a manner that will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48.

42. Here, Defendants do not permit dealers to clock in more than 7 minutes before a shift, and supervisors have repeatedly warned Plaintiff and other dealers that they cannot do so.

7

43. As a result of Defendants' rounding policy, Plaintiff and other dealers have been required to perform pre-shift work without pay since 2010.

### E. Post-Shift Work

44. Dealers must clock out at the end of each shift.

45. While scheduled shifts end on the hour (*e.g.*, 7:00 a.m., 3:00 p.m., 11:00 p.m.), dealers regularly have to work later. There are a number of reasons for this: if a shift change or replacement is late, if a pre-shift meeting runs long; if a dealer has to wait for a break in play to "tap-out"; or if he has to stay late due to unresolved player or security issues.

46. While dealers regularly must stay late, they rarely, if ever, leave before the scheduled shift ends, unless they are assigned to "break" for the last 20 minutes, or they are released early because business was unusually slow.

47. After "tapping out," Defendants require dealers to clock out **no later than** 7 minutes after the hour (*e.g.*, by or before 7:07 a.m., 3:07 p.m., 11:07 p.m.).

48. Since dealers must clock out within seven minutes or less after each shift, all work they performed during this 7 minute period is unpaid.

49. As noted, an employer can round up or down to the nearest quarter hour if, over time, it does not result "in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48.

50. As dealers cannot clock out more than 7 minutes after a shift ends, the rounding policy permanently denies them pay for all work they perform in the 7-minute period after the shift ends.

### F. Dealers are not Paid for Pre- and Post Shift Work

51. Defendants have not maintained accurate records of the time Plaintiff and other dealers worked or paid them wages owing, including overtime.

52. Though dealers were assured they would be paid "hourly" and receive overtime if they worked more than 40 hours per week, they have, in effect, been paid on a "per shift" basis.

53. Since July 2010, Defendants have been rounding up or down to nearest quarter hour. As a result, 7 minutes or less of work performed before or after a shift is always "rounded down" to 0 minutes and dealers are never paid for doing it. Since dealers must clock in no earlier than 7 minutes and clock out no later than 7 minutes, the rounding policy benefits Defendants alone and systematically deprives dealers of pay for work they are required to perform.

54. Since 2010, The Meadows has applied its rounding policy to dealers and, upon information and belief, "hourly" floor supervisors and "hourly" "dual-rate" supervisors (*i.e.*, who split shifts working both as a dealer and supervisor).

55. Upon information and belief, the timekeeping and payroll systems used to pay dealers are also used for first-level "hourly" floor supervisors and "hourly" "dual rate" supervisors.

56. All Casino dealers and, upon information and belief, all first-level "hourly" supervisors and "dual rate" "hourly" supervisors, are covered by the same Employee Handbook and Table Games Department rules.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

57. Plaintiff brings Count I, the FLSA claim, as a collective action pursuant to 29 U.S.C. § 216(b).

58. Plaintiff brings Counts II–V (violation of the Pennsylvania Minimum Wage Act, 43 P.S. § 333 *et seq.* ("PMWA"), breach of contract, violation of the Wage Payment and

9

Collection Law, 43 P.S. § 260.1 *et seq.* ("WPCL"), and unjust enrichment) as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and a "Class" consisting of:[1]

>All current and former table games dealers (including poker dealers) who worked at the Meadows Casino & Racetrack in Washington County, PA from July 1, 2010 to the present.

59. Meadows Casino dealers who opt in may pursue claims under the FLSA in accordance with 29 U.S.C §216(b).

60. If Plaintiff's state law claims are certified for class-wide treatment, all similarly situated dealers who do not opt-out may pursue these.

61. Plaintiff, individually and on behalf of similarly situated employees, seeks collective relief based on The Meadows' failure to pay wages owing, including overtime. The number and identity of plaintiffs yet to opt-in and consent to participate as party-plaintiffs can be determined from The Meadows' records, and potential class members can be easily and quickly notified of the pendency of this action.

62. At all relevant times, Plaintiff and other dealers were similarly situated, in that they had substantially similar jobs and pay, and were adversely affected in like manner by Defendants' failure to pay them wages owing for hours worked before or after scheduled shifts.

63. Plaintiff's state law claims satisfy the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of a Fed. R. Civ. P. 23 class action.

64. The Class satisfies the numerosity standard of Fed. R. Civ. P. 23(a)(1), as it consists of hundreds of persons and joinder of all class members in a single action is

---

[1] Plaintiff reserves the right to amend this class definition and scope of the FLSA action if discovery confirms that hourly floor supervisors and dual-rate supervisors were similarly situated and subject to the same or substantially similar pay policies and pre- and post-shift work requirements as Plaintiff and Meadows dealers or if other relevant facts emerge warranting amendment.

impracticable. Class members may be informed of the pendency of this action through U.S. mail, email, and/or other means of publication.

65. Questions of fact and law common to the Class predominate over questions affecting only individual members and include, without limitation, the following:

    a. Whether Plaintiff and Class members were employed by The Meadows on an "hourly" basis;

    b. Whether The Meadows paid Plaintiff and Class members wages owing for all hours worked before and after scheduled shifts;

    c. Whether The Meadows paid Plaintiff and Class members overtime owing for hours worked in excess of 40 per week;

    d. Whether The Meadows kept accurate records of the hours worked by each dealer and the wages paid to each;

    e. Whether The Meadows' failure to pay Plaintiff and Class for work before and after scheduled shifts violates the WPCL;

    f. Whether The Meadows' failure to pay Plaintiff and Class members for hours worked in excess of 40 per week violated the FLSA, PMWA, and the WPCL.

    g. Whether The Meadows' failure to pay Plaintiff and Class members wages for work performed before and after scheduled shifts entitles them to recover liquidated damages under the WPCL;

    h. Whether The Meadows' failure to pay Plaintiff and Class members for hours worked in excess of 40 per week entitles them to recover liquidated damages under the FLSA.

66. The above questions predominate over any questions affecting individual persons, and a class action is superior with respect to consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the state law claims.

67. Plaintiff's claims are typical of the Class in that Class members were employed in the same or similar positions and subject to the same or similar unlawful practices.

68. Plaintiff is an adequate Class representative as he is a member of the Class; his interests do not conflict with the Class; and he and his counsel, who have extensive experience prosecuting complex employment and class actions, will adequately protect Class' interests.

69. A class action is appropriate for fair and efficient adjudication of this controversy because The Meadows has acted or refused to act on grounds generally applicable to the Class, and because prosecution of separate actions by individual class members creates a risk of establishing incompatible standards of conduct for The Meadows, and may substantially impede the ability of Class members to protect their interests.

70. A class action is superior to other means for fair and efficient adjudication of this dispute because the damages suffered by individual Class members are not of sufficient magnitude to be efficiently litigated individually. Even if this was not so, individual cases would not be preferable to class litigation. Separate actions would unnecessarily burden the courts and could result in inconsistent adjudications, while a class action can determine, with judicial economy, the rights of all Class members.

## COUNT I

**(Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*)**

71. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

72. At all relevant times, Plaintiff and similarly-situated dealers have been entitled to the rights, protections, and benefits of the FLSA, 29 U.S.C. §§ 201 *et seq.*

73. The FLSA regulates, among other things, payment of overtime by employers whose employees are engaged in interstate commerce, or production of goods for commerce, or employed in an enterprise engaged in commerce or production of goods for commerce. 29 U.S.C. § 207(a)(1).

74. The Meadows is subject to the FLSA's overtime requirements as an enterprise engaged in interstate commerce with employees engaged in commerce.

75. The Meadows violated the FLSA by failing to keep accurate records and pay overtime to Plaintiff and similarly situated dealers.

76. None of the FLSA's exemptions from overtime obligations apply here. See Section 13, 29 U.S.C. § 213.

77. Plaintiff and similarly situated dealers are victims of a uniform policy, which The Meadows applied in violation of the FLSA.

78. Dealers are entitled to damages equal to mandated overtime for the three years preceding filing of their consents to join forms, plus periods of equitable tolling, because The Meadows acted willfully and knew, or showed reckless disregard of whether, the FLSA prohibited its conduct.

79. Since The Meadows failed to act in good faith and lacked reasonable grounds to believe its actions and omissions were lawful, Plaintiff and the Class are entitled to liquidated damages in an amount equal to the unpaid overtime owing as described in FLSA Section 16(b), 29 U.S.C. § 216(b). Alternatively, should the Court find that The Meadows did not act willfully, Plaintiff and the Class are entitled to prejudgment interest at the applicable legal rate.

80. As a result of Defendants' willful acts, Plaintiff and the Class were deprived of overtime in amounts to be determined and to recover such amounts and liquidated damages, pre- and post-judgment interest, counsel fees and costs under 29 U.S.C. § 2l6(b).

## COUNT II

**(Violation of Pennsylvania Minimum Wage Act of 1968, 43 P.S. § 333 *et seq*.)**

81.     Plaintiff incorporates all allegations in the preceding paragraphs.

82.     The Class Period for this claim is December 31, 2010 through present.

83.     At all relevant times, Plaintiff and the Class were entitled to the rights, protections and benefits of the PMWA, 43 P.S. § 333 *et seq*.

84.     The PMWA provides that employees "shall be paid overtime not less than one and one-half times the employe's regular rate." 43 P.S. § 333.104(c).

85.     The PMWA exempts certain employees from overtime obligations. See 43 P.S. § 333.105. None of these exemptions applies here.

86.     Since 2010, dealers at times worked in excess of 40 hours per week.

87.     The Meadows violated the PMWA by failing to pay overtime to Plaintiff and Class members for hours worked in excess of 40 hours per week.

88.     The Meadows' conduct was willful because it knew or should have known that its policy and practice denied overtime to non-exempt employees for hours worked in excess of 40 at the required time-and-a-half rate.

89.     Plaintiff and Class members are victims of The Meadows' uniform policy, which denied them overtime at the time-and-one-half rate.

90.     By failing to pay overtime to Plaintiff and the Class, Defendants are liable under the PMWA, 43 P.S. § 333.113, for overtime, costs, reasonable attorneys' fees, and interest.

## COUNT III

### (Breach of Contract: Failure to Pay Straight-Time and Overtime Wages)

91. Plaintiff incorporates all allegations in the preceding paragraphs.

92. The Class Period for this claim is July 1, 2010 through present.

93. Plaintiff and Class members accepted employment with Defendants at an agreed upon hourly rate (plus gratuities) and were assured they would be paid at this rate for each hour worked. The Meadows documented each employee's rate at hiring and when the rate increased.

94. The Meadows distributed a Handbook to employees that provides they will be paid for "hours worked" and paid time-and-a-half for more than 40 hours of week a week.

95. Plaintiff and Class members accepted The Meadows' offer of employment, which gave rise to employment contracts.

96. The Meadows breached the employment contract by failing to pay Plaintiff and Class members their regular hourly wages for all hours they worked and/or overtime due, as required by Pennsylvania law.

97. At The Meadows' behest, Plaintiff and Class members worked before and after scheduled shifts with a reasonable expectation they would be paid for doing so.

98. By failing to pay Plaintiff and Class members for work performed before and after scheduled shifts, The Meadows violated their employment contracts.

99. The Meadows is liable to Plaintiff and the Class for damages as a result of its failure to pay them wages owing for work performed pre- and post-shift.

## COUNT IV

### (Violation of Wage Payment and Collection Act, 43 P.S. § 260.1 *et seq.*)

100. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

101. The Class Period for this claim is December 31, 2010 through present.

102. The Meadows willfully failed to pay Plaintiff and the Class regular wages and overtime for more than thirty (30) days after their regularly scheduled paydays.

103. As a result, Plaintiff and Class members are entitled to liquidated damages in the amount of 25% of wages and benefits due, or $500, whichever is greater, in addition to any unpaid wages and benefits.  43 P.S. § 260.10.

104. Pursuant to 43 P.S. §260.9a, Plaintiff and the Class are also entitled to costs and reasonable attorneys' fees incurred in bringing this claim.

## COUNT V

### (Restitution based upon Unjust Enrichment)

105. Plaintiff incorporates all allegations in the preceding paragraphs.

106. This claim is brought on behalf of Plaintiff and the Class in the alternative.

107. The Class Period for this claim is July 1, 2010 through the present.

108. Throughout the relevant period, Plaintiff and Class members were required to work before and after scheduled shifts without pay.

109. In Pennsylvania, an employer's failure to pay an employee for time worked may form the basis of an unjust enrichment claim.  See, e.g., Braun v. Wal-Mart Stores, Inc., 24 A.3d 875 (Pa. Super. 2011); Lugo v. Farmer's Pride, Inc., 967 A.2d 963 (Pa. Super. 2009).

110. The Meadows received a direct and substantial benefit from the unpaid work performed by Plaintiff and the Class and no circumstances exist to justify Defendants' retention of these wages.

111. Allowing The Meadows to retain these wages is unjust since: it is not entitled to these funds, keeping them would be a substantial windfall; the amount is more than *de minimus*; and The Meadows control these funds now only because it has long withheld wages due.

112. Accordingly, Plaintiff and the Class are entitled to restitution of their wages and overtime due and owing, and to such other relief as the Court deems fair and equitable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment against The Meadows as follows:

A. That the Court declare, adjudge and decree that this action is a proper FLSA collective action and certify Count I on behalf of others similarly situated pursuant to 29 U.S.C. § 216;

B. That the Court declare, adjudge and decree that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23, and certify Counts II-V on behalf of the proposed Class;

C. That, at the earliest possible time, the Court issue notice to or permit Plaintiff to notify all affected persons that an action asserting FLSA claims has been filed, of the nature of the action, and of their right to join the suit if they believe they were denied wages;

D. On Count I (FLSA):

(i) Declare that The Meadows violated the overtime provisions of the FLSA, 29 U.S.C. § 207, as to Plaintiff and similarly situated persons who opt into this action; that The Meadows' violations were willful; that The Meadows failed to keep accurate records of time worked; that Plaintiff and other similarly situated persons are entitled to be paid overtime for work in excess of 40 hours per week; that the amount of unpaid overtime to which Plaintiff and others similarly situated are entitled is to be doubled as liquidated damages and awarded to them;

(ii) Award Plaintiff and other similarly situated persons who opt into this action damages in the amount of unpaid overtime compensation to be proven at trial;

(iii) Award Plaintiff and other similarly-situated persons who opt into this action liquidated damages in an amount equal to the overtime

    compensation shown to be owed pursuant to 29 U.S.C. § 216(b), or, if liquidated damages are not awarded, then in the alternative, prejudgment interest;

  (iv) Award reasonable attorneys' fees and costs;

E. On Count II (PMWA):

  (i) Declare that The Meadows violated the PMWA;

  (ii) Award damages to Plaintiff and the Class in the amount of unpaid overtime according to proof at trial;

  (ii) Award Plaintiff and the Class pre-judgment interest at the highest level rate, from and after the date of service of the initial complaint in this action on all unpaid wages from the date such wages were earned and due;

  (iii) Award reasonable attorneys' fees and costs;

F. On Count III (Breach of Contract):

  (i) Declare that The Meadows breached its employment contracts with Plaintiff and the Class;

  (ii) Award Plaintiff and the Class damages for the amount of unpaid regular wages and overtime, including interest;

G. On Count IV (Violation of WPCL):

  (i) Declare that The Meadows violated the WPCL by failing to pay regular wages and overtime for pre- and post-shift work to Plaintiff and the Class; that The Meadows acted without good faith or reasonable grounds; and that Plaintiff and the Class are entitled to liquidated damages;

  (ii) Award damages to Plaintiff and the Class in the amount of unpaid regular wages and overtime due;

  (iii) Award liquidated damages to Plaintiff and the Class in an amount equal to 25% of unpaid regular and overtime wages, or $500, whichever is greater;

  (iv) Award reasonable attorneys' fees and costs;

    H.      Count V (Restitution based upon Unjust Enrichment)

           (i)      Award Plaintiff and the Class restitution in the amount of their unpaid regular and overtime wages, including interest thereon;

    I.      Attorneys' fees and costs of the action;

    J.      Pre- and post-judgment interest; and

    K.      Such other relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims and/or issues so triable.

                                                                 Respectfully submitted,

Dated:  December 31, 2013                    s/Maureen Davidson-Welling
                                                      Maureen Davidson-Welling
                                                      PA ID No. 206751
                                                     mdw@stembercohn.com
                                                     Jonathan K. Cohn
                                                     PA ID No. 92755
                                                     jcohn@stembercohn.com
                                                     John Stember
                                                     PA ID No. 23643
                                                     jstember@stembercohn.com
                                                     **STEMBER COHN & DAVIDSON-**
                                                           **WELLING, LLC**
                                                     1616 Allegheny Building
                                                     429 Forbes Avenue
                                                     Pittsburgh, PA  15219
                                                     T.: (412) 338-1445
                                                     F.:  (412) 338-1446

                                                     *Attorneys for Plaintiff*